The State v Moore.

---

THE STATE *v.* SEABORNE *alias* CALVIN MOORE.

The killing a slave, like that of a free person, may be either murder or manslaughter according to the circumstances of the case ; and both offences are punishable by the laws of this State. The 16th section of the stat. 7 June, 1806, was enacted for the purpose of removing all doubt on this subject.

The acts of the Legislature, in 1806, were passed in both the English and French languages, both being texts ; and they must be construed the one by the other—as parts of a whole, and not as distinct acts or expressions of the legislative will.

The second section of the stat. of 20 March, 1818, punishing the crime of manslaughter, applies to the offence when committed on a slave, as well as on a free person.

The provision of the first section of the stat. of 20 March, 1818, that on trials for murder, the jury may find the prisoner guilty of manslaughter, is not inconsistent with the 18th sect. of the 6th art. of the constitution.

An indictment commencing " State of Louisiana, Parish of, &c.," which recites that, " The grand jurors for the State of Louisiana, &c., acting in the name and by the authority of the State," &c., is a sufficient compliance with sect. 6, of art. 4 of the constitution, requiring all prosecutions to be carried on in the name and by the authority of the State.

It is sufficient in an indictment, to charge that an offence was committed in a particular parish ; no further designation of the place is necessary. An averment that the offence was committed *at* a parish is equivalent to *in* the parish.

Where on an indictment for murder the jury find the prisoner guilty of manslaughter, it is not necessary that the verdict should expressly negative the murder, nor declare whether the manslaughter was voluntary or involuntary, the law making no difference in the punishment of voluntary or involuntary manslaughter.

The State v. Moore.

In criminal proceedings it is not necessary that the verdict should be written upon the indictment or signed by the foreman of the jury. It is sufficient that a verdict be delivered orally, in open court, when it is recorded.

As every indictment for murder contains virtually an accusation of manslaughter, a verdict on such an indictment, finding the prisoner " guilty of manslaughter in manner and form as charged" is strictly correct.

In criminal proceedings no foreman is appointed to the jury.

The Code of Practice has no application to criminal prosecutions.

APPEAL from the District Court of Concordia, *Willson*, J.

*Preston*, Attorney General, for the State.

*Finney*, for the appellant. In criminal cases, by the common law, the accused may take advantage of mere formal objections. 1 Chitty's Crim. Law, 122. 1 Leach, 134. *Territory* v. *Nugent*, 1 Mart. 169. The indictment should have set forth more particularly the place where the crime was committed. 1 Chitty's Crim. Law, 197. 3 Bacon, 755, *verbo* Juries, E. The verdict should have shown whether the homicide was voluntary or involuntary, the latter being no crime at all. The court will not presume any thing against the prisoner. 4 Black. 192. The verdict is not responsive to the issue, in not negativing the murder. 2 Hawk. 620. 7 Bacon's Abridg. *verbo* Verdict, H. 1 Chitty's Crim. Law, 638. Cro. Eliz. 296. Co. Lit. 282. The verdict is absurd in finding the prisoner guilty of manslaughter " in the manner and form charged in the indictment,"—such a verdict must mean guilty " with malice aforethought," as charged in the indictment. *State* v. *Upton*, 1 Devereux, 316. The verdict is unconstitutional. The stat. of 1818 (1 Moreau's Dig. 389) could not annul the provision of the constitution. The verdict was not signed by the foreman of the jury; nor does it appear that there was any foreman. 3 Robinson's Pract. 262. 1 Munf. Rep. 254. A clerk's certificate of a fact is no evidence. 1 Mart. N. S. 522. It does not sufficiently appear that it was the verdict of the jury at all. 1 Chitty's Crim. Law, 634–5. The judge, *a quo*, and the jury, overlooked the important distinction between an offence committed on the person of a free white, and on that of a slave. Slaves are expressly excepted from the general code defining and punishing crimes and misdemeanors. 1 Moreau's Dig. 373, s. 47. There is a particular code for the punishment of offences committed by or upon slaves, which must govern this case. 1 Moreau's Dig. 118, s. 16. The statute punishing the homicide of a slave speaks of the wilful killing—the French text using the word *malicieusement;* and this text should govern. The killing of a slave in the heat of blood, or involuntary manslaughter, is not punished; it has been overlooked by the legislator, and the court cannot supply the omission. *Territory* v. *Nugent*, 1 Mart. 169. The punishment inflicted by the judgment is greater than the law authorizes. 1 Moreau's Dig. p. 118, s. 16; p. 367, s. 22.

*Saunders* and *Frost*, on the same side.

JOHNSON, J.   The defendant, Calvin Moore, was indicted at the May term of the District Court for the parish of Concordia, for the murder of Hardy Ellis.   At the same term he was tried, convicted by the jury of manslaughter, and sentenced by the court to seven years imprisonment at hard labor.   From the judgment of the District Court he has appealed.

The principal questions presented for our consideration grow out of a bill of exceptions taken to the charge of the court, and to the refusal of the judge to give the following instructions to the jury, viz. :

" 1st. If the jury find from the evidence in the case, that the deceased was a slave, they must find for the accused, unless they find that he killed the deceased deliberately, or with malice expressed or implied.

" 2d. If the jury find from the evidence, that the deceased was a slave, and that the accused killed him in a sudden affray, without malice, express or implied, the law is for the defendant.

" 3d. That if the deceased was a slave, they cannot find the accused guilty of manslaughter, but the case must be governed by the Black Code.

" 4th. That where the words of a territorial law are different in the English and French versions, the provision of the constitution making the English version the only rule, does not apply, such laws having been passed previously to the adoption of the constitution.

" 5th. That, by the constitution, a party charged with murder cannot be found guilty of manslaughter.

" 6th. That, whether the prisoner considered the deceased a slave or not, if he was in fact a slave, the Black Code governs."

The court, on the contrary, charged the jury :

" That the condition of the deceased, whether slave or free, did not affect the character of the offence; that manslaughter was a crime which could be committed by a free white man on the body of a slave; that the English side of a territorial statute, in case of discrepancy or doubt, was to govern; and that, if the prisoner treated the deceased as free, he could not set up his slavery as a defence, even if it were a defence in law."

The position is taken in the charge asked for, and in the arguments presented to this court, that the wilful and malicious killing of a slave is the only crime created by our statutes, and that manslaughter, when a slave has been the subject of the homicide, is an offence unknown to our laws, and to the commission of which no punishment has been annexed.   In support of this position, the defendant relies upon the statute of 1806,

which enacts, that "if any person whatsoever shall wilfully kill his slave, or the slave of another person, the said person being convicted thereof, shall be tried and condemned according to the laws of the territory," &c. Bull. & Curry's Dig., 61. It is contended, that this is the *only* statute which declares the killing of a slave to be a crime; that the word "*malicieusement*" is used in the French version, in lieu of "*wilfully*" in the English, which makes the crime murder; and that this version should control, as being most favorable to the accused.

At an early day, the Supreme Court of this State said; "That the acts of the Legislature, from 1806, inclusive, were passed in both languages; an original in each received the signature of the Speaker of the House of Representatives, of the President of the Council, and the approbation of the Governor; so that they are both *texts;* and the practice of the court has been to construe them, the one by the other. But we cannot consider the two acts otherwise than as parts of a whole, and not as distinct expressions of the Legislature—as two acts." 2 Mart. 177.

If the rule of construction here prescribed be adopted, as asked for by the defendant, we find that the English and French versions "are both texts, and to be construed the one by the other, not as two separate acts, but as parts of a whole."

We do not concur with the counsel, that the interpretation is *always* to be given to an act which is most favorable to the accused. If such a rule were *invariably* observed, the act now under consideration furnishes an instance of the consequences which would flow from it. For, had the accused been convicted of murder, the English version would have been most favorable to him, as, taken singly, it reduces the crime to manslaughter; whereas, when convicted of manslaughter he would ask, as he now does, that the French version should control, considering that version the most favorable; thus the statute might become nugatory and inoperative. It is manifestly intended to declare some description of homicide of slaves to be punishable; that intention may be gathered from the circumstances under which the act was made, and by comparing it with laws *in pari materia.* From these it appears, that slaves are regarded both as persons and property ; and the intention of the lawgivers must have undoubtedly been, to discharge the obligations which humanity and sound policy imperatively imposed upon them, of giving the most ample protection, both to the person of the slave, and to the property of the citizen, from all such acts of violence as might result in death, when accompanied with malice, or mitigated by such circumstances as would reduce the crime to manslaughter. At the time that this act was passed, there existed upon our statute books, laws defining the crimes both of murder and man-

slaughter, and providing for their punishment, in which no reference is made to slaves or persons of color. Slaves were considered as persons enjoying all the rights and privileges of citizens, of which they had not been deprived by express legislation, and as entitled to the protection of the laws. As such, they might then have been the subjects either of murder or manslaughter. The act now under consideration, appears to have been subsequently passed from abundant caution, for the express purpose of obviating the question which is now presented, and of removing any doubt which might have previously existed with regard to the homicide of a slave.

It has been contended, however, that no greater punishment can be imposed upon the accused, than that established by the territorial statute referred to in the act of 1806. This brings us to the inquiry, whether the statute of the 20th March, 1818, is of universal application, or limited in its operation to manslaughter committed upon free persons. The language of the act is general: "If any person shall hereafter commit manslaughter, and shall be thereof convicted," &c. B. & C.'s Dig. 246. We have seen that the crimes both of murder and manslaughter were known to the laws of the territory, and that the object of the act of 1806 was, to remove all doubt as to the mode of their prosecution and extent of their punishment, when committed upon slaves. While the law stood thus, the Legislature proceeded to extend the limits previously prescribed to the discretion of the judge in awarding the punishment for manslaughter, without excepting the crime when committed on a slave. We must suppose, that the statute was framed with reference to the then existing laws, which recognized no difference of color or condition, as far as related to the crime in regard to which they were legislating; and that the intention of the Legislature was, that it should apply generally to the offence, upon whomsoever committed.

An analogous question arose in the courts of Tennessee, where it underwent an elaborate investigation. By an act of that State, the wilful and malicious killing of a negro or mulatto slave, with malice aforethought, is made murder, and the offender punishable with death, without the benefit of clergy. The accused was indicted for the murder of a negro man slave, and found by the jury guilty of manslaughter. A motion was made in arrest of judgment, because the jury had found the defendant guilty of manslaughter, which crime, where the person slain was a slave, did not, in point of law, exist. Much learning and ability appear to have been brought to the investigation of the point. The learned judge from whose opinion we quote, says; "We cannot concur with the view the counsel has taken of this case, and

assent to the position, that the common law, or its principles, are not to have an influence in the decision of this case. It is true, as observed in the argument, that pure and proper slavery never subsisted in England, giving the master power of life and death over the slave, but a species of slavery or servitude existed there from the earliest times; the subjects of it were not styled slaves, but villeins, and their state and circumstances much resemble that of slaves at the present day." After showing the points of resemblance between the condition of villeins and slaves, which are striking, the judge proceeds; "By the common law, murder is where a person of sound mind and discretion, unlawfully killeth any reasonable creature, in being, under the king's peace, with malice aforethought, either expressed or implied. Manslaughter is the unlawful killing of another, without malice either expressed or implied. Both these definitions include the villein, and the negro or mulatto slave."

The judge proceeds to say; "That the judgment is the same, that would have been rendered against the accused, if the subject of the homicide had been a free man, instead of a negro slave. There is no law authorizing any distinction between the two cases, There was no distinction at common law between the judgments in homicide for killing a free man, and the killing a villein." Law of Slavery, 255, *et seq.* The court consequently held, that the crime was manslaughter. Much of the reasoning used in the able opinion from which we quote, applies with peculiar force to a case arising in this State, where "crimes, offences, and misdemeanors are to be taken, intended and construed according to, and in conformity with the common law of England." Bul. & Cur. Digest, 248.

Under the 18th sect. of the 6th art. of the constitution, which declares, that "in all criminal prosecutions, the accused has the right of being heard by himself or counsel, and of demanding the nature and cause of the accusation against him, it is contended, that the rule of the common law, that a party charged with murder might be convicted of manslaughter, has been changed, and that the act of 1818, authorizing such a verdict, is unconstitutional. At the time when the constitution was adopted, the common law rules of proceeding in criminal cases were in force here. Under our system at that day, as at the present, a person indicted for murder was informed by the instrument, a copy of which he received, of the "nature and cause of the accusation against him." He also understood, that by the existing laws, such an indictment contained virtually a charge of manslaughter against him, and that he would be called upon to answer both accusations. He knew, that if upon the trial, the killing was proved to have been committed with deliberate malice, the jury

might convict him of murder'; and, that if the homicide was unlawful, but without malice, they might convict him of manslaughter only.　There appears to us nothing in this clause of the constitution, repugnant to the common law in force at the time of its adoption ; and the object of the framers of that instrument was, not to abrogate the rules of criminal proceedings in this respect, but to secure to persons under criminal accusation, the rights which they then enjoyed.

The indictment is objected to as defective, because it does not "run in the name of the State of Louisiana," as required by the constitution, nor set forth, with sufficient accuracy, the place where the crime was committed.　The instrument commences, "State of Louisiana, Parish of Concordia," and, after setting forth the style of the court, the time when and place where it was held, proceeds thus : "The Grand Jurors for the State of Louisiana, good and lawful men &c., acting in the name, and by the authority of the State of Louisiana," &c. using the precise language of the constitution, art. 4, § 6.·

It has been considered essential at common law, not only to state in the indictment the county in which the offence was committed, but also the particular parish, ville, hamlet, or place within the county, to which a *venire* might be awarded ; and, although the reason for this has long ceased in England, the jury being now summoned from the county at large, yet the practice has survived, of averring that the crime was committed at a certain parish, &c.　1 Chitty, Crim. Plead. 196.·　Our statute prescribes, that the forms of indictment, divested however of unnecessary prolixity, changing what ought to be changed, shall be, except as is otherwise provided for, according to the common law of England.　Bul. & Cur. Dig. 248.　By our laws, the jury is selected from the inhabitants at large of the parish.　There is no smaller or other territorial subdivision from which a jury can be called, and there consequently can exist no reason, under our system, for designating any other place in which, or at which, a crime was committed.　The district attorney has in our opinion, very properly changed what ought to have been changed, and divested the indictment of that which here would have been an unnecessary prolixity.

We consider the averment, that the crime was committed " at" the Parish of Concordia, to be a sufficient averment, that it was perpetrated within that parish.

The verdict is in the following words : " We, the jury, find the prisoner, Seaborne *alias* Calvin Moore, guilty of manslaughter, in manner and form as charged in the indictment."　It is contended, that it should contain a declaration, that the manslaughter was either voluntary or involuntary, and that the murder

should have been negatived. Whether the killing was voluntary or involuntary, if unlawful and without malice, it was equally manslaughter. The statute establishes no difference in the grades of the offence. The mode of trial, the rights of the accused, and the punishment of the offender, are the same in either event. Thus there appears to us no sound reason why the jury should ascertain the particular description of manslaughter, or announce it to the court.

The earlier practice, at common law, upon indictments for murder, when the jury convicted the accused of manslaughter, was specifically to acquit of the murder and find guilty of manslaughter. This practice, however, has long since ceased to be considered indispensable in England, and was never necessary here. 1 Chitty, Crim. Plead. 644.

The verdict of the jury has not been signed by their foreman, nor does any foreman appear to have been appointed by the court. We do not consider it necessary, either that the verdict should be written upon the indictment, or signed by the foreman. It is sufficient to render it *ore tenus*, and that it be delivered in open court. When the jury agree, they are called upon to say simply, whether the prisoner be guilty or not guilty of the offence of which he stands indicted ; to which through their foreman, they answer briefly, " guilty," or " not guily," as the case may be. This verdict when received is recorded, much in the form used in the present instance, and then read to the jury. This is the only record of it necessary, and the only minute of it made. 1 Chitty, Crim. Plead. As every indictment for murder contains virtually an accusation of manslaughter, and the accused is called upon to answer both charges, the expression used in the verdict, that the prisoner was guilty " in manner and form as charged," is strictly correct.

In criminal practice, the court appoints no foreman. No such officer is known to the court or to the law. He is merely the person selected by the jury themselves, as their spokesman, to announce their verdict to the court. A different practice prevails in civil proceedings, depending, however, upon special legislative enactment. The rules of proceeding prescribed by the Code of Practice, have no application to criminal prosecutions.

Although the judge may have erred in his instructions to the jury, with regard to the rule of interpretation to be applied to the act of 1806, his charge is more favorable to the accused than it would have been, had it accorded with the view we have taken of the law. He might properly have instructed them, that slaves could become the subjects of either murder or manslaughter, independently of the act of 1806.

*Judgment affirmed.*